

2006 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-20-2006

# Prusky v. Reliastar Life Ins

Precedential or Non-Precedential: Precedential

Docket No. 05-1611

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2006

Recommended Citation

"Prusky v. Reliastar Life Ins" (2006). *2006 Decisions*. Paper 1175.
http://digitalcommons.law.villanova.edu/thirdcircuit_2006/1175

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2006 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 05-1611

PAUL M. PRUSKY, INDIVIDUALLY AND AS TRUSTEE,
WINDSOR SECURITIES, INC. PROFIT SHARING PLAN;
STEVEN G. PRUSKY, AS TRUSTEE, WINDSOR
SECURITIES, INC. PROFIT SHARING PLAN,
Appellants

v.

RELIASTAR LIFE INSURANCE COMPANY

Appeal from the United States District Court
for the Eastern District of Pennsylvania
District Court Civil No. 03-cv-06196
District Judge: The Honorable Herbert J. Hutton

Argued January 27, 2006
Before: RENDELL and SMITH, *Circuit Judges,*
and IRENAS, *District Judge*[*]

[*]The Honorable Joseph E. Irenas, Senior District Judge for the
District of New Jersey, sitting by designation.

Arlin M. Adams
Bruce P. Merenstein    [ARGUED]
Schnader Harrison Segal & Lewis LLP
1600 Market Street, Suite 3600
Philadelphia, PA  19103
    *Counsel for Appellant*s

Joseph P. Moodhe    [ARGUED]
Debevoise & Plimpton LLP
919 Third Avenue
New York, NY 10022

Mathieu J. Shapiro
Obermayer Rebmann Maxwell & Hippel LLP
One Penn Center, 19th Floor
1617 John F. Kennedy Boulevard
Philadelphia, PA  19103
    *Counsel for Appellee*

## OPINION OF THE COURT

IRENAS, *Senior District Judge*.

Paul and Steven Prusky (collectively the "Pruskys") appeal from an order of the United States District Court for the Eastern District of Pennsylvania denying partial summary judgment on their breach of contract claims and entering summary judgment *sua sponte* in favor of ReliaStar Life Insurance Company ("ReliaStar").  The District Court had

2

jurisdiction under 28 U.S.C. § 1332. We exercise appellate jurisdiction pursuant to 28 U.S.C. § 1291. For the reasons set forth below, we will reverse the grant of summary judgment to ReliaStar and remand the case to the District Court.

**I.**

Between February 1998 and March 1999, the Windsor Securities, Inc. Profit Sharing Plan (the "Plan"), through its trustees, the Pruskys, purchased seven flexible premium variable universal life insurance policies from ReliaStar. The policies, which are identical for all purposes relevant to this appeal, each named the Plan as the policies' owner and was payable on the last to die of Paul Prusky[1] and his wife, Susan. As of August 2, 1999, the Plan had paid almost $2.5 million in premiums for various death benefits amounting to more than $42 million. However, it is the use of the policies as an investment vehicle that is at the root of the dispute in this case.

Many traditional life insurance policies provided that a portion of the premium be set aside in a policy reserve which accrued interest at a predetermined rate, set by the terms of the policy, which is unrelated to the return on the investments made by the insurance company. This reserve is, in effect, paid out to the beneficiary as part of the face value of the policy when the insured dies, and, as the basis of the policy's cash value, can be used for borrowing or returned to the policy's owner should a decision be made to terminate the policy. *See* Joseph E. Irenas, *Life Insurance Income Under the Federal Income Tax*, 21 Tax L. Rev. 297, 297-301 (1966). "[M]ost insurance policies are not only contracts covering the risk of death, . . . but also vehicles of saving by which money is deposited with the insurance

---

[1] Paul Prusky brought suit individually and as a trustee of the Plan.

3

company to accumulate at interest for the benefit of the policy holder." *Id.* at 297.

At some point certain segments of the life insurance industry recognized that a life insurance policy which, like traditional whole life insurance, offered a fixed death benefit and a substantial savings component and, unlike a traditional policy, offered the policyholder a right to control in some fashion the investment of accumulated reserves, might be attractive to individuals who believed they had superior investment skills. The seven flexible premium variable universal life policies purchased by the Plan from Reliastar contained this investment control feature.

Pursuant to the policies' terms, ReliaStar maintained a unit investment trust, the "Variable Account." The Variable Account, in turn, was divided into various mutual fund sub-accounts, in which the Plan was entitled to invest a portion of the net premiums paid.[2] Thus, the cash values of the policies were tied to the market value of the assets held in the sub-accounts. The Plan's trustees often communicated daily with ReliaStar, directing the allocation of its assets among the sub-accounts in an effort to increase the cash value of the policies.[3]

---

[2] Premiums needed to keep each policy in force could be paid by the Plan or deducted from the Variable Account to the extent that its investment performance would not reduce the account below the minimum required by a particular policy.

[3] Each policy also provided that investments could be allocated to a "Fixed Account" which would earn interest at a rate determined by the policy which was not tied to ReliaStar's actual investment performance. However, in all policies the Plan chose to allocate 100% of its investments to the Variable Account.

4

ReliaStar's standard policies provided that (1) "written" transfer requests could be made only four times in a policy year and (2) transfers would be made on the first valuation date after the request was received.  The policies also provided that Reliastar could charge a fee for each transfer up to a maximum of $25.00.  However, the Pruskys specifically negotiated alternate terms.  The amendments to each of the seven policies were embodied in seven practically identical memoranda drafted by ReliaStar's Second Vice President, M.C. Peg Sierk (the "Sierk Memos").

First, the Sierk Memos gave the Plan the right to make daily transfers by telephone, facsimile, or other electronic means in unlimited amounts without any transfer fee.  Thus the provisions facilitated the Pruskys' preferred investment strategy of making frequent trades to take advantage of short-term variations in mutual fund pricing, a practice commonly known as "market timing."[4]

Second, the Sierk Memos allowed the Plan to execute trades until 4:00 p.m. Central Standard Time (CST) -- one hour after the New York Stock Exchange (NYSE) closes at 4:00 p.m. Eastern Standard Time (EST) -- and mandated that those after-closing transfers receive unit values calculated for that day.

---

[4]  Market timing seeks to take advantage of information that has not yet been incorporated into the price of a security held in a mutual fund's portfolio.  Because net asset values ("NAVs") are typically calculated once daily, market timers must conduct transactions frequently to obtain the advantage of the price / value discrepancy.  *See generally* Disclosure Regarding Market Timing and Selective Disclosure of Portfolio Holdings, 68 Fed. Reg. 70,402 (Dec. 17, 2003).  The parties do not dispute that market timing is legal.

This practice is known as "late trading." [5]

Beginning in March 1998, Paul Prusky placed sub-account transfer requests, by telephone or other electronic means, often on a daily basis, and ReliaStar made the transfers. Many of the transfer requests were made between 3:00 p.m. and 3:30 p.m. CST (after the NYSE had closed for the day) but were valued at the current day's price.

In November, 2002, ReliaStar informed the Plan that it would no longer implement transfer instructions as of the date

---

[5] The term "late trading" is somewhat misleading because trading after the close of the market is entirely permissible so long as the trades are priced using the NAV set the next day. *See* Pricing of Redeemable Securities for Distribution, Redemption and Repurchase, 17 C.F.R. § 270.22c-1 ("No registered investment company issuing any redeemable security . . . shall sell, redeem, or repurchase any such security *except at a price based on the current net asset value of such security which is next computed after receipt of a tender of such security for redemption or of an order to purchase or sell such security*.") (emphasis supplied). The Rule's requirement that prices be based on the next computed NAV is referred to as "forward pricing." Disclosure Regarding Market Timing and Selective Disclosure of Portfolio Holdings, 68 Fed. Reg. 70,402 (Dec. 17, 2003). Thus, late trading may be more aptly described as violating the forward pricing rule. Appellants do not seek to enforce the late trading provisions of the Sierk Memos, which explicitly provided that the price of the securities transferred would be based on the current day's NAV, contrary to the forward pricing rule.

received unless the requests were received by the close of the NYSE (3:00 p.m. CST). ReliaStar's stated reason for the change was to comply with applicable law and regulations requiring transfer requests made after the close of NYSE to be valued at the next day's price. The Pruskys objected to this unilateral change of the agreement, but nonetheless continued dealing with ReliaStar, and ReliaStar continued to honor all trades made by electronic means (so long as they were placed before 3:00 p.m. CST) until October 8, 2003, when it notified the Plan that, after receiving a complaint from the Pioneer funds, it would no longer accept trades "via facsimile, phone or internet" in those funds. Effective November 7, 2003, that restriction was applied to trades in all funds, thereby effectively eliminating the Pruskys' ability to execute daily transfers in accordance with their market timing strategy.

This diversity suit followed, seeking damages for breach of contract and specific performance of only the market timing provisions. Neither damages nor specific performance was sought for the elimination of the late trading provisions of the Sierk memos. The Pruskys moved for partial summary judgment on liability only. ReliaStar opposed the motion asserting, among other things, that because the late trading provisions were both illegal and an integral part of the contract between the parties, the policies were void in their entirety. The District Court accepted this argument, denied the Plan's motion for partial summary judgment, and, *sua sponte,* entered summary judgment in favor of ReliaStar. Because of this ruling the trial judge did not consider other defenses raised by ReliaStar in opposition to the partial summary judgment motion. The Pruskys filed this timely appeal.

## II.

Because we are reviewing a grant of summary judgment,

7

our review is plenary. *Am. Flint Glass Workers Union v. Beaumont Glass Co.*, 62 F.3d 574, 578 (3d Cir. 1995). Drawing all reasonable inferences in favor of the party against whom judgment is sought, judgment pursuant to Federal Rule of Civil Procedure 56 should be granted only when no issues of material fact exist and the party for whom judgment is entered is entitled to judgment as a matter of law. *Id.*

The Pruskys assert that the District Court procedurally erred by *sua sponte* entering summary judgment in favor of ReliaStar without adequate notice, and substantively erred by concluding that the late trading provision voided the life insurance contracts in their entirety, thereby precluding the Pruskys from enforcing the market timing provisions. We hold that the District Court erred on the merits[6] and will reverse and

---

[6] We also note that "'A district court may not grant summary judgment *sua sponte* unless the court gives notice and an opportunity to oppose summary judgment.' . . . orders granting summary judgment *sua sponte* endanger important rights, and . . . are likely to result in judicial inefficiency and deprivation of the rights of one of the parties." *Am. Flint Glass Workers Union*, 62 F.3d at 578 n.5 (quoting *Otis Elevator Co. v. George Washington Hotel Corp.*, 27 F.3d 903, 910 (3d Cir. 1994)); *see also Chambers Dev. Co. v. Passaic County Utils. Auth.*, 62 F.3d 582, 584 n.5 (3d Cir. 1995) ("a judgment cannot be entered without first placing the adversarial party on notice that the court is considering a *sua sponte* summary judgment motion. The court must also provide the party with an opportunity to present relevant evidence in opposition to that motion.")(citing *Celotex v. Catrett*, 477 U.S. 317, 326 (1986)). Though we do not decide the issue, nothing in the record indicates that the District Court provided the Pruskys with actual notice that it was considering entering summary judgment in favor of ReliaStar, and it is debatable whether the Pruskys otherwise had sufficient

remand.

## III.

The District Court held that the undisputed evidence demonstrated that the illegal late trading provisions were "an essential and non-severable part of the [life insurance] contracts." We disagree.

Under Pennsylvania contract law, a party my enforce legal provisions of a contract containing an illegal provision provided that the primary purpose of the contract or an essential part of the agreed exchange is not affected by disregarding the illegal provision. *Spinetti v. Service Corp. Int'l*, 324 F.3d 212, 219-20 (3d Cir. 2003) (quoting Restatements (First) and (Second) of Contracts, §§ 603 and 184 respectively); *see also Huber v. Huber*, 323 Pa. Super. 530, 538 (1984) (holding the child support provisions under post-nuptial agreement were enforceable although the other terms of the contract may have been illegal); *Forbes v. Forbes,* 159 Pa. Super. 243, 249 (1946) (upholding validity of contract when disregarding the illegal provision "would not defeat the primary purpose of the contract").

The undisputed record evidence demonstrates that the primary purpose of the contracts at issue was to insure the lives of Paul and Susan Prusky, while simultaneously providing the Plan with savings and investment opportunities. This goal may be accomplished without the late trading provisions.[7] Certainly

---

notice to satisfy this requirement.

[7] Despite the Pruskys' assertions that the late trading provisions of the contracts could in theory be performed in a manner consistent with applicable law and regulations and

the late trading provision did not impact the life insurance aspect of the ReliaStar policies.[8] Nor was the goal to use the policies as investment vehicles meaningfully impaired. Whatever value the right of late trading may have been to the Pruskys, it is small compared to the overall investment benefit of the policies which the Pruskys have striven hard to keep in effect. For more than a year after ReliaStar informed the Plan that it would no longer permit late trading on orders received after 3 p.m. CST, the Plan continued to place numerous sub-account transfer requests before the NYSE closed, which ReliaStar honored.[9]

The Plan surely bargained for the late trading provisions, but such bargaining does not *per se* turn the provision into one that is the "primary purpose" of the policy. Contract

_____

therefore are not illegal, we agree with the District Court's conclusion that the late trading provisions of the contracts specifically allowed the Plan to execute transfers after the close of the NYSE, receiving the current day's NAV instead of the next day's NAV, in violation of the forward pricing rule.

[8] These policies were issued more than six years ago. Particularly for insureds in the age group of Paul and Susan Prusky, life insurance may become more valuable with the passage of time.

[9] Appellee argues that one cannot modify a contract without the mutual consent of both sides, and it alleges that the Plan never really agreed to the elimination of the late trading provisions and, indeed, resisted the change. Standard contract principles would certainly provide that a new obligation cannot be placed on a contracting party without that party's consent. In this case elimination of the late trading right may have some impact on the Plan, but puts no new burden whatever on ReliaStar.

negotiations often involve a series of offers and counter-offers involving issues large and small. The fact that a bargained for benefit is ceded by the other party is no particular indication of the importance of the benefit to either side of the deal. Indeed, the willingness of one side to concede a benefit to another might just as well be a sign of its unimportance. Moreover, the importance of a contract right to a particular party is not necessarily an indication that it is the "primary purpose" of the contract. Potential parties to a contract may invest a great deal of importance to what others might consider a minor point.

## IV.

ReliaStar argued three alternate grounds for upholding the grant of summary judgment, not relied upon by the District Court, two of which were argued on this appeal: (i) changed circumstance had rendered the performance of the market timing provisions of the Sierk memos impracticable and impossible; and (ii) the market timing provisions, although not illegal, were not enforceable because they violated public policy.[10]

ReliaStar asserts that it should be excused from performing its obligations in the Sierk Memos because recent regulatory developments designed to deal with market timing have made performance impracticable. Under Pennsylvania law, a party's obligations may be discharged by a "supervening impracticability" "where after the contract is made, a party's performance is made impracticable without his fault by the occurrence of an event, the non-occurrence of which was a basic assumption on which the contract was made, his duty to render

---

[10]  We are considering these issues because the Court of Appeals may affirm the grant of summary judgment on grounds different from those relied upon by the District Court. *Maschio v. Prestige Motors*, 37 F.3d 908, 910 n.1 (3d Cir. 1994).

11

that performance is discharged, unless the language or the circumstances indicate to the contrary." *Luber v. Luber*, 614 A.2d 771, 774 (Pa. Super. Ct. 1992) (quoting Restatement (Second) of Contracts § 261). "The theory of legal impossibility is objective rather than subjective; the act contemplated under the settlement must be incapable of being performed." *Felix v. Giuseppe Kitchens & Baths, Inc.*, 848 A.2d 943, 948 (Pa. Super. Ct. 2004). On the record before us ReliaStar has not met this standard.

ReliaStar in fact allowed the Plan to execute frequent transfers via electronic means, which clearly indicates that the contract could be performed. ReliaStar honored such transfers (as long as they were executed before the close of the NYSE) until late 2003. Moreover, while regulators have focused more attention on dealing with the perceived adverse effects of market timing in recent years[11] no regulation prevented ReliaStar from executing frequent transfers submitted by electronic means. The regulatory focus on market timing[12] may have imposed

---

[11]    *See, e.g.*, Disclosure Regarding Market Timing and Selective Disclosure of Portfolio Holdings, 68 Fed. Reg. 70,402 (Dec. 17, 2003).

[12] We also question whether increased regulatory attention to market timing can be considered changed circumstances at all. The practice of market timing was well known at the time the Sierk Memos were drafted, as were the funds' distaste for such practices. *See Windsor Secur., Inc. v. Hartford Life Ins. Co.*, 986 F.2d 655, 666 (3d Cir. 1993) ("market timing caused increased trading and transaction costs, disruption of planned investment strategies, forced and unplanned portfolio turnover, lost opportunity costs, and subjected a fund's asset base to large asset swings that diminished a fund's ability to provide a maximized return to all contract owners. . . .These concerns

12

difficulties on ReliaStar in conducting these transactions, but increased burden on a party does not render performance impracticable. *See Luber*, 614 A.2d at 774 ("a party generally assumes the risk of his own inability to perform his contractual duties").[13]

---

were shared by others in the mutual fund industry and noted by the Securities and Exchange Commission. *See* Offers of Exchange Involving Registered Open-End Investment Companies and Unit Investment Trusts, Investment Company Act Rel. No. IC-16504, 53 Fed. Reg. 30,299, 30,301, 30,307 (1988). During [1989 and 1990], other mutual funds such as Fidelity Investments and Vanguard Group began imposing 'anti-timer' restrictions to mitigate the perceived negative effects of unrestricted timing activity.").

[13] The question of ReliaStar's contractual obligation should a particular fund lawfully refuse to honor a purchase or sale initiated by Plan on the ground that it involved market timing is not before this Court. While the Pioneer Mid Cap Fund apparently did raise the issue of market timing with ReliaStar, nothing in the record suggests any fund has ever refused to execute an order from ReliaStar initiated by the Pruskys. We note that effective May 23, 2005, the Securities and Exchange Commission adopted 17 C.F.R.
§ 270.22c-2(a). This provision may bar the redemption of fund shares within seven days of issue unless a redemption fee is paid. This same regulation may also require a financial intermediary, like ReliaStar, to agree not to execute purchases or exchanges of fund shares for shareholders who have been identified by the fund as violators of a fund's policies on market timing. § 270.22c-2(a)(2). The impact of this new regulation and other recent developments on the rights and duties of the parties may be considered by the District Court on remand.

Similarly, we also conclude that the market timing provisions do not violate public policy. ReliaStar readily admits that market timing is not illegal and that investors are expressly permitted to engage in market timing under applicable regulations. Yet ReliaStar asserts that they are excused from performing because market timing is a "disruptive," "suspect and disfavored activity." This is not the law. "Public policy is to be ascertained by reference to the laws and legal precedents and not from general considerations of supposed public interest. As the term 'public policy' is vague, there must be found definite indications in the law of the sovereignty to justify the invalidation of a contract as contrary to that policy." *Prudential Prop. & Cas. Ins. Co. v. Colbert*, 813 A.2d 747, 750 (Pa. 2002). We find no basis in the laws or legal precedents to conclude that market timing is contrary to public policy. Thus we hold ReliaStar's nonperformance may not be excused on public policy grounds.[14]

---

[14] ReliaStar also argued before the District Court (but not on appeal) that the Pruskys are precluded from recovering pursuant to the doctrine of unclean hands because the Pruskys accepted brokers' commissions on the contracts at issue in violation of Pennsylvania law in effect at the time. "No insured person . . . shall, directly or indirectly, receive or accept, or agree to receive or accept, . . . all or any part of any . . . broker's commission [on insurance]." 40 P.S. (Purdon's) § 276 (Repealed by 2002, Dec. 6, P.L. 1183, No. 147, § 1). The Pruskys replied that any such acceptance was legal because Steven Prusky accepted commissions in his capacity as a broker at a time when he was neither a trustee of the Plan nor an insured. Even assuming, *arguendo,* that Steven Prusky did accept illegal commissions, unclean hands do not bar relief because the misconduct does not have an "immediate and necessary relation" to the market timing provisions. *New Valley Corp. v. Corporate Prop. Assocs. 2 & 3 (In re New Valley Corp.)*, 181 F.3d 517 (3d Cir. 1999).

## V.

Based on the foregoing we will reverse the District Court's *sua sponte* grant of summary judgment to ReliaStar and remand the case to that Court for further proceedings consistent with this Opinion.